Filed 5/29/19

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D074351 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD275226) |
| ANTONIO HURTADO, | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Howard H. Shore, Judge.  Affirmed.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, Tami F. Hennick and Genevieve Herbert, Deputy Attorneys General, for Plaintiff and Respondent.

Antonio Hurtado appeals an order requiring him to pay victim restitution to the City of San Diego (City) for seven incidents of graffiti.  Hurtado argues the City's method for calculating restitution was "generalized and non-case-specific," and thus, violated the

requirements set forth in *Luis M. v. Superior Court* (2014) 59 Cal.4th 300 (*Luis M.*).

Accordingly, Hurtado maintains that the trial court abused its discretion when it relied on the City's methodology to impose victim restitution in the amount of $3,000. We are not persuaded. The trial court properly exercised its discretion when awarding restitution, and we agree with the People that the restitution amount awarded was based on a rational and factual basis reasonably related to Hurtado's criminal vandalism. Therefore, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The San Diego District Attorney filed an information alleging Hurtado committed three counts of vandalism over $400 (Pen. Code,[1] § 594, subd. (a)(b)(1); counts 1-3); and four counts of vandalism under $400 (§ 594, subd. (a)(b)(2)(A); counts 4-7). The district attorney further alleged that Hurtado committed all seven counts for the benefit of a criminal street gang within the meaning of section 186.22, subdivisions (b)(1) and (d). Also, the information alleged that Hurtado had a prior strike conviction within the meaning of sections 667, subdivisions (b) through (i) and 1170.12.

Hurtado pled guilty to counts 4 and 5, admitted the gang enhancement for each count, and admitted the prior strike conviction. Hurtado also agreed to a *Harvey*[2] waiver. On the People's motion, the court dismissed the remaining counts against Hurtado.

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

[2]     *People v. Harvey* (1979) 25 Cal.3d 754.

The court sentenced Hurtado to prison for a total of eight years, eight months.[3]

In connection with the vandalism counts, the People, on behalf of the City, sought victim restitution in the amount of $3,112.02. In their restitution brief, the People argued that the probation report, the request from the City, and the preliminary hearing transcript provided sufficient basis to establish the requested restitution amount. It explained that the City determined the cost of abating graffiti by using a cost per square foot, which was $3.39 based on its 2016 fiscal year graffiti calculation. It then multiplied the total square footage of Hurtado's graffiti abatement to determine the requested restitution amount. The brief also included costs associated with each count. Attached to the brief were various documents supporting the restitution amount, including the probation report, a report from the district attorney's office that detailed each specific alleged graffiti incident, emails from the City regarding the total restitution amount, and a restitution request form.

Hurtado opposed the amount of restitution the City requested, arguing in his restitution brief that the amount claimed by the City was not based on the actual damages caused by Hurtado but instead, on a generalized and non-case specific restitution estimate. Specifically, he stated the $3.39 cost per square foot did not consider the specifics of Hurtado's graffiti, such as the method of creating the graffiti, the surface the graffiti was on, the materials used to abate, or the manpower used for abatement. Hurtado also maintained that the sole factor considered by the City's damage estimate

---

[3]    A portion of Hurtado's prison sentence arises from another case (No. SCD276119). The facts and underlying crime of that case are not relevant here.

was square footage, which was "highly subjective." Hurtado thus requested the court order restitution in the amount of $963.78 and submitted a chart explaining how he calculated the requested amount.

In response, the People filed a supplemental brief, arguing there was a sufficient factual nexus between the City's calculations and Hurtado's acts of graffiti.

The court subsequently held a restitution hearing. The People submitted on the preliminary hearing transcript, which the court took judicial notice of and admitted into evidence.

Relevant here, P.H., a supervising management analyst for the City, testified at the preliminary hearing. He explained that graffiti on City property is abated by in-house utility workers while graffiti on private property is abated by Urban Corps, a nonprofit organization that had a contract with the City. The City does not pay Urban Corps on a per-incident basis. Instead, Urban Corps sends the City a monthly invoice for all abatement completed in that month. P.H. believed the value of the annual contract between the City and Urban Corps was about $300,000.

According to P.H., the City uses Sales Force, an app, to track all graffiti removed in San Diego. For each incident, the individual abating the graffiti uploads a photograph of the graffiti as well as the date, time, location, type of surface defaced, and the removal method. The individual also includes the total square footage of damage. The information contained in Sales Force is then entered into a graffiti tracking program called Graffiti Tracker. Graffiti Tracker can generate a "D.A. Report" that details all information about a specific graffiti incident. Additionally, the report includes the

4

estimated cost of abatement for each incident, which is automatically calculated using a cost per square foot based on a formula developed by the City. The City uses a cost per square foot because it does not have work order information about specific abatements. Its formula divides the projected budget for graffiti abatement for that fiscal year by the total square footage abated the previous year. The expenses included in calculating the budget consider employee salaries, employee benefits, materials, equipment, running the dispatch center, the Urban Corps contract, and other overhead. P.H. also explained that the square footage calculation accounted for the surface type and the method of removal.

For the 2016 fiscal year, the City's graffiti restitution cost per square foot for graffiti abatement was $3.39. P.H. calculated this amount by dividing the total expenses for the graffiti abatement program ($1.1 million) by the total square footage abated (332,000 square feet).[4]

At the restitution hearing, Hurtado's counsel called P.H. as a witness. In addition to having P.H. repeat some of his preliminary hearing testimony, including reviewing the calculations that led to the $3.39 per square foot figure, counsel asked P.H. to specifically look at the incident of graffiti for count 3. In doing so, Hurtado's counsel referred P.H. to an email where P.H. was analyzing the specific cost of the abatement for count 3. In conducting that analysis, P.H. assumed the abatement would take two and a half to three and a half hours for the actual abatement. This assumption was based on P.H.'s

---

[4] P.H. testified that the amount of restitution calculated was low because the City used $3.39 per square foot based on the 2016 fiscal year. However, most of Hurtado's incidents of graffiti occurred in 2017 wherein the cost per square foot was $5.01.

discussion with the superintendent overseeing the graffiti abatement section for the City. P.H. also assumed that the abatement would require typical staffing; thus, he posited two utility workers would be used for the abatement, with one being paid $54 an hour and the other being paid $62 per hour. Then multiplying those wages by three and a half hours of work, P.H. calculated the abatement to be $406. He also estimated an additional $50 for materials for a total abatement cost of $456.[5]

Hurtado's counsel asked P.H. to use the same method to estimate the cost to abate the graffiti underlying count 1, which was double the size as the graffiti in count 3. Under counsel's hypothetical, P.H. estimated the cost for count 1 to be $812.[6] However, P.H. stated that the method proposed by counsel was not used "because there's too many things that could impact the cost that we just don't have good information on." He believed it would be impossible to get a precise number given that he did not have all the necessary information for specific incidents. For example, P.H. stated that Urban Corps submitted monthly invoices and did not submit invoices associated with a particular incident.

---

[5] This total was less than the $847.50 amount calculated based on the $3.39 per square foot formula for count 3. However, P.H. stated that the $456 amount did not consider other costs, like running the dispatch center and other overhead. Nor did it consider whether the incident required multiple coats of paint, additional chemicals, or more time because of a hard to reach location. Additionally, P.H. stated that the analysis of the cost of abatement for graffiti for count 3 was focused on whether the graffiti resulted in more than $400 in damage to warrant a felony charge as opposed to calculating a restitution amount.

[6] The Graffiti Tracker D.A. Report listed a restitution amount of $1,444.14 to abate the graffiti for count 1.

Hurtado's counsel also called L.C., who worked for Urban Corps, as a witness. She abated the graffiti underlying counts 1 and 2. Using a measuring reel, she measured the square feet of the graffiti abated right after she painted over it. She would multiply the square footage by the number of coats of paint she used. For example, the area painted in count 1 was smaller than the listed square footage of 426, which indicated that she had used multiple coats of paint. After she abated an incident of graffiti, she would upload a photograph of the abatement and indicate the square footage and the removal method. She was trained to paint over the entire wall and not to "patch" over just the graffiti. L.C. also testified that her hourly wage was $15.50, and she would always go to a job site with a partner. Her mileage sheet showed that she was at the sites for the graffiti in counts 1 and 2 for about an hour.

After the witnesses finished testifying, the court admitted into evidence a seven-page Graffiti Tracker D.A. Report of each alleged graffiti incident attributable to Hurtado. The report listed the total restitution amount as $3,112.02, consisting of $1,444.14 to abate count 1, $474.60 to abate count 2, $847.50 to abate count 3, $84.75 to abate count 4, $135.60 to abate count 5, $40.68 to abate to count 6, and $84.75 to abate count 7. For each alleged incident, the report included a photograph of the graffiti, the square footage, the name of the person who completed the abatement, the date, and the time. The court also admitted a two-page document that included the restitution calculation for the 2016 fiscal year, which detailed the specific methodology used to determine the City's cost per square foot for graffiti abatement. Additionally, the court admitted a four-page document containing the mileage logs from Urban Corps.

After the close of evidence, the People argued that the City's method of calculating the restitution amount did not run afoul of *Luis M*., *supra*, 59 Cal.4th 300. She noted there was a sufficient nexus here because photographs of each incident were introduced, which indicated with some specificity the method of abatement. She also argued the amount properly included administrative costs and other overhead. The prosecutor emphasized that P.H. had explained that the requested amount was an underestimate because it was based on the 2016 fiscal year cost per square foot rather than that for 2017.

Hurtado's counsel asserted that P.H. was not a graffiti abatement expert, noting that he did not perform abatements or know the number of hours or equipment abatement required. Counsel further contended that the City's method of calculation violated the requirements set forth in *Luis M*., *supra*, 59 Cal.4th 300. Hurtado's counsel stated that calculating square footage is "only one factor among many that [the City] could have considered" in calculating restitution, but asserted that when the City's method is challenged by a defendant with evidence that could raise a question regarding the initial estimate of the amount, the court should consider the evidence and methodology provided by the defendant to ascertain whether the City's estimate was rational. Ultimately, counsel argued the appropriate amount of restitution was $963.78.

After considering the evidence and entertaining oral argument, the court stated:

> "I'm not going to engage in any specific calculations. It's a fool's errand, in my opinion, to try to figure out exactly what was spent on a particular cleanup job when there are no invoices and this is all based on projections, estimates, and the like. [¶] I think it's important to remember that the essential law of restitution gives extremely broad almost unfettered discretion to courts to set

8

restitution so long as there is a rational basis for that restitution order."

The court further explained:

"The essential purpose of restitution is for the court to attempt, as much as possible, to make the victim whole. Obviously the court is not interested in providing a windfall to any victim, but, on the other hand, the court has to make a reasonable attempt to restore whatever the victim has lost as a result of the defendant's crime. And it is—all this is because the defendant committed a crime."

In emphasizing it had "very broad discretion[,]" the court made clear it was "not adhering to any mathematical formula" but was "simply determining whether the amount being requested by the City ha[d] some rational basis." The court also indicated that the issue was not whether there existed "a more accurate method" than that used by the City. The court further observed that "[t]his case is distinct from the cases that have rejected calculations of restitution because in this case, we have evidence from the preliminary hearing, we have photographs to support the claim of the amounts here based on square footage." In addition, the court explained why the City's reliance on square footage was sufficient:

"Square footage is one factor, but I can't say it's an irrational factor where it's impossible to calculate the exact cost of labor, the time it takes, the surface—I mean, there are so many variables involved in this type of remedial activity, it would be impossible in any given case absent specific invoices from contractors to calculate the exact amount of loss."

Ultimately, the court determined that Hurtado was to pay victim restitution in the amount of $3,000.

Hurtado timely appealed.

DISCUSSION

Under section 1202.4, subdivision (f), a restitution order "shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct . . . ." It shall include payment for the value of damaged property, which, when repairs are made, shall be "the actual cost of repairing the property." (§ 1202.4, subd. (f)(3)(A).) The restitution statute expressly provides that a governmental entity may be entitled to restitution when it is responsible "for repairing, replacing, or restoring public or privately owned property that has been defaced with graffiti," when it has sustained an economic loss because of graffiti vandalism. (§ 1202.4, subd. (k)(5).)

Courts have broad discretion in fixing the amount of restitution, and they may use any rational method, provided it is reasonably calculated to make the victim whole. (*In re Dina V.* (2007) 151 Cal.App.4th 486, 489.) "We review the restitution award for abuse of discretion. [Citation.] 'On appeal, we presume that a judgment or order of the trial court is correct, " '[a]ll intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " ' [Citation.]" (*People v. Santori* (2015) 243 Cal.App.4th 122, 126 (*Santori*).)

Here, Hurtado maintains that the method used by the City to calculate the amount of restitution he owed was improper under *Luis M.*, *supra*, 59 Cal.4th 300 and *In re Kyle T.* (2017) 9 Cal.App.5th 707 (*Kyle T*). As we explain below, neither case is helpful to Hurtado's argument.

10

In *Luis M.*, the minor defaced six locations in the City of Lancaster with nine acts of graffiti. (*Luis M.*, *supra*, 59 Cal.4th at p. 303.) At his restitution hearing, a crime prevention officer used a five-year-old cost model to estimate the city's annual graffiti abatement costs; the model included labor and material costs for both investigation and removal of graffiti. (*Id.* at p. 304.) The officer compared that cost model to the city's annual expenditures and concluded that the city's average outlay per graffiti incident was $431.32. The officer then multiplied that figure by the minor's nine instances of graffiti to arrive at a total loss amount of $3,881.88. (*Ibid.*) Significantly, the officer offered "no information about the actual abatement costs related to [the minor's] conduct." (*Ibid.*) The trial court ordered restitution in the amount of $3,881.88, based on the officer's testimony. (*Ibid.*) The Court of Appeal issued a writ vacating the order, and our high court affirmed. (*Id.* at p. 303.)

The California Supreme Court determined the restitution award "was not based on sufficient evidence that the amount of claimed loss was a result of [the minor's] conduct." (*Luis M.*, *supra*, 59 Cal.4th at p. 303.) It explained that the general restitution statute applicable to juvenile offenders, which it noted was " 'parallel' " to section 1202.4 at issue in the instant case (see *Luis M.*, at p. 304), limits restitution to " 'economic losses incurred *as the result of the minor's conduct*' " (*id.* at p. 305) such as " 'the *actual cost* of repairing the property when repair is possible.' " (*Ibid.*) The award may include "the materials, equipment, and labor costs incurred for remediation" (*id.* at p. 309), as well as "[p]reexisting expenditures, such as salaried employees and equipment purchases, . . . provided those costs can be fairly apportioned on a pro rata basis to the

11

minor's conduct." (*Id*. at p. 309.) While a trial court awarding restitution "need not ascertain the exact dollar amount of the [c]ity's losses" (*ibid*.), and "retains broad discretion . . . to estimate the material, equipment, and labor costs necessary to repair the damage caused by a discrete act of graffiti" (*id*. at p. 310), its calculation "must have some factual nexus to the damage caused by the minor's conduct." (*Id.* at pp. 309, 310.) Because the city's restitution model did not reflect the actual or estimated costs to clean up the graffiti caused by the minor's conduct, the court affirmed the opinion of the Court of Appeal to vacate the restitution order. (*Id*. at p. 303.)

Contrary to the facts in *Luis M*., in the instant action, the trial court's determination had "some factual nexus to the damage caused" by Hurtado's criminal acts. As the People point out, at the restitution hearing, they submitted photographs of each incident of graffiti attributable to Hurtado as well as evidence of the size of the square footage, the surface type on which each incident of graffiti occurred, and the removal method. More importantly, the method of calculation of the amount of restitution used by the City specifically considered the size of the graffiti Hurtado created. The City multiplied the total square footage of the seven incidents of graffiti by the average cost per square foot to abate graffiti. And the average cost per square foot was not calculated by using a five-year-old cost model like the one the crime prevention officer used in *Luis M*. Instead, P.H. testified that he used the graffiti abatement budget for the 2016 fiscal year divided by the previous year's total square footage of graffiti abated. Moreover, P.H. testified regarding the factors that were considered in establishing the budget. As such, the trial court's restitution order below had "some factual nexus to the damage caused by"

12

Hurtado's conduct and did not violate *Luis M.*, *supra*, 59 Cal.4th 300. (See *id.* at pp. 309, 310.)

In addition, our conclusion does not change when we consider *Kyle T.* In that case, the minor challenged the sufficiency of the evidence to support his charge of felony vandalism, which required at least $400 in damage. (*Kyle T.*, *supra*, 9 Cal.App.5th at p. 709.) The court determined that the evidence did not support the juvenile court's finding of felony vandalism. (*Id.* at p. 713.) In addition, the court remarked that the evidence failed to satisfy the use of average costs in calculating victim restitution. (*Id.* at p. 717.)

However, the evidence relied upon the by People in *Kyle T.* was de minimis. In fact, the only evidence of damages was a police department "graffiti removal cost list." (*Kyle T.*, *supra*, 9 Cal.App.5th at p. 711.) The testifying officer, who based his damages estimate exclusively on this list (*id.* at p. 715), admitted that he did not prepare it, could not identify who did, could not explain how the costs on the list were determined, and did not know the cost of materials or the number of people needed to make repairs. (*Id.* at p. 711.) The People did not offer the list, photographs of the graffiti, or any other documentation in evidence. (*Id.* at pp. 711, 715.) Essentially, the People argued that every incident of graffiti costs $400 to remove, regardless of its specific characteristics. The "generic, one-size-fits-all removal cost of $400 for every incident of graffiti on [c]ity-owned property" did not suffice because it was a "non-case-specific damages estimate, not an estimate tethered to the facts of [the minor's] vandalism." (*Id.* at p. 714.)

13

Here, the City did not utilize a formula that attributed the same cost to remove every incident of vandalism like the one used in *Kyle T.* Thus, *Kyle T.* is not instructive.

Although we find this case to be distinguishable from both *Luis M.* and *Kyle T.*, we conclude that the method used by the City to calculate victim restitution here compares favorably with the method that passed muster in *Santori*, *supra*, 243 Cal.App.4th 122.

In *Santori*, a crime prevention officer testified that it took the city an average of 100 minutes to remove a piece of graffiti. She examined photographs of the defendant's 32 instances of graffiti and concluded that 100 minutes was a reasonable estimate for each incident, even though some may have taken more time to remove and others less; she did not know the actual number of hours the city spent abating the defendant's graffiti. The officer considered the costs of a cleanup crew, administrative costs, her salary, investigative costs, and a graffiti-tracking computer program to arrive at a per-minute graffiti abatement cost. (*Santori*, *supra*, 243 Cal.App.4th at p. 125.) She multiplied the 32 incidents by the 100 minutes and by the per minute cost to arrive at an estimate. After the trial court deducted the portion attributable to investigative costs, it relied on the officer's estimate to award the City $18,878.23 in restitution. (*Ibid.*)

The defendant contended that the evidence underlying the order was insufficient to establish the "factual nexus" required by *Luis M.* (*Santori*, *supra*, 243 Cal.App.4th at p. 126.) The appellate court disagreed and concluded that the witness "followed the . . . mandate in *Luis M.* She was familiar with graffiti abatement and established the average cost per minute to restore the defaced surfaces. . . . In contrast to *Luis M.*, here

14

the crime prevention officer considered the photographs depicting defendant's graffiti when she calculated the cost to restore the defaced surfaces. [Her] opinion was based on defendant's graffiti not just an average for removal of the city's graffiti." (*Santori*, at p. 127.)

In the instant action, the calculation used by the City is like the one used in *Santori*. Here, the City established the average cost per square foot to abate graffiti and multiplied that number by the total square footage of Hurtado's incidents of graffiti. This is similar to the method the court found sufficient in *Santori*, wherein the city estimated that each incident of graffiti would require 100 minutes to abate and then multiplied the 32 incidents by the 100 minutes and by the per-minute cost of abatement to arrive at an estimated restitution amount.

Nevertheless, Hurtado asserts that we should not follow *Santori*, *supra*, 243 Cal.App.4th 122 because he presented evidence that called into question the calculations used by the City, and the defendant in *Santori* did not do so. Although we agree that Hurtado presented evidence challenging the City's methodology, we stop short of concluding that he disproved the amount of loss claimed by the City as he asserts. During the restitution hearing, Hurtado's counsel asked P.H. to calculate abatement costs based on an assumed amount of time it would take to abate the graffiti multiplied by the hourly wages of the workers abating the graffiti. Yet, as P.H. noted at the hearing, counsel's suggested method did not consider various other expenses, like the dispatch

15

center, employee benefits, or other overhead.[7]  Thus, the City presented the trial court with its formula for calculating restitution, and Hurtado countered with another method.  It was well within the trial court's discretion to weigh the evidence presented to determine whether the City's methodology produced a restitution amount that had a factual nexus to Hurtado's criminal acts.  It did not abuse its discretion in finding the City's methodology satisfied the criteria set forth in *Luis M*., *supra*, 59 Cal.4th 300 and *Santori*, *supra*, 243 Cal.App.4th 122.  Moreover, its decision to order restitution in the amount of $3,000 was close to the City's request for $3,112.02.  Accordingly, although the trial court claimed to not be using any specific mathematical formula, it clearly considered the City's formula in awarding restitution and believed it provided the required factual nexus.  Based on the record before us, we cannot say that the trial court abused its discretion in awarding $3,000 in victim restitution.

---

[7]  Additionally, the factors Hurtado's counsel asked P.H. to use to create an alternative calculation of the cost of abatement appeared to be based on abatement tasks completed by the City.  Here, Urban Corps abated Hurtado's incidents of graffiti.

16

DISPOSITON

The order is affirmed.


                                                                      HUFFMAN, J.

WE CONCUR:



BENKE, Acting P. J.



DATO, J.