Filed 9/15/21  In re J.T. CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re J.T., a Person Coming Under the Juvenile Court Law. | C069844 |
| THE PEOPLE, | (Super. Ct. No. JV129856) |
| Plaintiff and Respondent, | |
| v. | |
| J.T., | |
| Defendant and Appellant. | |

After finding minor to be a person described in Welfare and Institutions Code section 602[1] related to multiple acts of graffiti vandalism, the juvenile court placed him on probation and made restitution to the City of Sacramento (the City) for the clean-up

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

costs as a condition of probation. Minor contends the juvenile court abused its discretion in the amount of restitution it awarded.

Given subsequent developments in the law, we conclude there was insufficient evidence to support the restitution award ordered by the court. Consequently, we reduce the award to $660, the amount for which a factual nexus was established at the restitution hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Agreed Resolution and Restitution Cap

A contested jurisdictional hearing commenced in which it was alleged that 17-year-old J.T. (the minor) committed multiple acts of graffiti vandalism. During trial, approximately 94 photographs of minor's tag on light posts, traffic and bus stop signs, benches, storm drains, fire hydrants, and private property were received into evidence. After several days of testimony, the minor decided he wanted to resolve his case. He admitted one count of felony vandalism (Pen. Code, § 594, subd. (b)(1)), which encompassed only 20 incidents of graffiti on property belonging to the City. In exchange for his admission, the minor received the dismissal of six remaining counts of vandalism and a promise that restitution for the abatement would be capped at $7,460. The parties understood that the City would assert a cost of $370 per incident. The court found that the admitted count was a felony and that the minor was a person described in section 602. The court placed the minor on probation and imposed restitution as a condition thereof with the amount to be determined after a restitution hearing.

### Restitution Hearing

At the beginning of the restitution hearing, the juvenile court stated for the record, "I heard the evidence which was presented at trial. [¶] . . . [¶] I heard that graffiti was placed upon certain property belonging to the City . . . .That graffiti was described by witnesses." The court acknowledged the prosecution proffer using a fee model formula and calculating restitution at $373 per incident. For the twenty admitted incidents, the

2

total proffered was $7,460. The court observed that since there was no dispute about the number of locations, the only question was the validity of the City's cost estimate at $373 per incident.

Noel Eusebio, a senior code enforcement supervisor for the City, testified that based upon the Fee Study, the City charged $373 per incident for juvenile graffiti abatement. The Fee Study, in which he had participated, involved thousands of graffiti cases per year and was completed on March 14, 2009.[2]

Factors considered in the City's Fee Study were the costs of intaking the graffiti complaint, dispatching an officer to initiate a case, documenting and photographing the graffiti, entering data into the system, scheduling the materials, scheduling a work order, scheduling staff, assembling an abatement crew, gathering necessary cleanup materials, transporting the abatement crew to and from the location of the graffiti, entering data regarding the case into the computer system, and appearances in court by persons such as Eusebio. Also included in the study were the proportionate costs of the gas, insurance and depreciation of vehicles used to transport the abatement crew from the "car barn" (location where the vehicle was stored) to the location of the graffiti and then returning to the car barn, and the wages for the abatement crew from the time they were dispatched to the time they returned.

The abatement crew that cleaned up the minor's graffiti consisted of one code enforcement officer, who was paid $20 to $28 per hour, and four youth workers, who were each paid $9.40 per hour. Although the minor only admitted to 20 incidents of graffiti, there were 12 other graffiti sites related to the count the minor admitted within

---

[2] A summary of the Fee Study (the Fee Study Summary) was admitted into evidence as the minor's Exhibit A. According to the summary, the actual average cost for each instance of graffiti abatement was $514.16; however, for graffiti abatement in juvenile cases there was a "subsidy" of $141.16, leaving the cost at $373 per incident.

the same area bearing his tag name. The abatement for all 32 sites was completed in one eight-hour day.[3]

The average amount of time for each incident of graffiti abatement was 15 to 45 minutes. They typically used Graffiti-X, a graffiti removal solution, and 3M scrubbies. Based on past experience, Eusebio estimated that the approximate time it took to abate each incident of the minor's graffiti was about 30 minutes, although he could not be certain without seeing the photographs. He did not bring records with him to the hearing showing how long it took to remediate each incident. He noted that all of the City's photographic documentation had been presented to the prosecutor's office.

Eusebio testified the fee was not based upon the actual time the abatement crew took to remove the minor's graffiti; rather, it was based on the study. While he testified that Graffiti-X was normally used, he did not estimate the amount that would have been used for the 20 incidents of graffiti at issue. In order to provide such an estimate, Eusebio testified he needed to see the evidence. Nor did he know the cost of Graffiti-X, although he thought he could find the cost "someplace." Eusebio also testified that if Graffiti-X does not work, they use a " 'more aggressive approach,' " but he could not tell if that was done in this case without looking "at the evidence, the photographic evidence." He also testified that using that approach ruins signs, but he could not say whether any signs needed to be replaced because of the minor's graffiti without looking at "the photographs and the evidence." Eusebio indicated he did not know whether a painter was needed to cover up the minor's graffiti, explaining: "Again, I would have to look at the photographs and the evidence."

---

[3] Initially, Eusebio thought the abatement might have taken "multiple days" based on the amount of the graffiti. And to confirm that, he would need to look at the evidence. Later, his attention was called to one of the exhibits introduced during the restitution hearing and he confirmed the remediation took place in a single day.

When asked about administrative costs, Eusebio listed: "[M]e appearing in court, intake at the 3-1-1 call center, documentation as far as physically entering data into the system, uploading that data, scheduling of staff." As far as can be determined from the record, whatever percentage of the administrative costs spent for time he spends in court must have also been an average; the time he actually spent in court on this case could not be determined before he actually spent time in court on this case. No evidence appears on the record, even on this easily determined cost.

As noted, the photographs were not available to Eusebio during his testimony. According to the juvenile court's clerk, the exhibits were returned to the "filing parties" after the earlier proceedings based on their stipulation. When the court asked if the exhibits were in the possession of the People, the prosecutor indicated that they were. The prosecutor indicated minor's counsel had her own set of the photographs.

Counsel for the minor requested that the juvenile court direct Eusebio "to gather or refer to or look at whatever documents or photographs or whatever else he needs to look at in order to be able to answer the specific questions about this particular case, the time it took abate the specific acts of graffiti, and what materials were used." The court stated it was disinclined to do so and indicated it was the minor's responsibility "to acquire that evidence to bring to court to show him." No specific photographs were ever referenced by anyone, including the court, during the restitution hearing.

### Argument and the Juvenile Court's Ruling

The minor's counsel argued the court should award restitution in the amount of $660. Counsel arrived at this figure by rounding upward the youths' rate of pay to $10 per hour, the supervisor's rate to $30 per hour and assumed the van could be rented for $100 per day. Thus, according to the minor, one eight-hour day, which was the time it took to clean up his graffiti, would cost the City $660 ($320 for the youths, $240 for the supervisor, $100 for the van.) The prosecutor continued to request that restitution amount be set at $7,460.

5

The juvenile court noted that cases interpreting section 730.6 hold that it is not necessary that restitution calculations be exact, "dollar for dollar, penny for penny." Rather, what is required is "two things: One is to use a method of valuation which is reasonable under the circumstances; and (2) use a method of valuation which makes the victim whole." The trial court ruled that the Fee Study was a reasonable method for calculating the cost of graffiti abatement. Specifically, the court recounted that the City collected all the financial data necessary to run the abatement operation for one year and total number of abatement tasks for the year. Dividing the total cost per year by the number of tasks per year yielded an average of $514.16 per task. Deducting the $141.16 subsidy the City allowed for juvenile cases, the cost was $373 per task. However, the court concluded that because the minor's graffiti related to the count he admitted was all in the same area and was cleaned up in a single day, it was unlikely that the abatement crew returned to the car barn after each abatement, which was an assumption used by the City in developing the Fee Study.[4] Therefore, the court discounted the $7,460 by 25 percent, resulting in the restitution award of $5,595. The court did not factor into its analysis any recollection of the photographic evidence it had seen during the trial. As noted, the restitution order was imposed as a condition of probation.

## DISCUSSION

The minor contends the juvenile court erred in using the Fee Study to determine the amount of restitution because "there was no evidence from which a rational determination of the [City's] loss could be made." Therefore, according to the minor, the amount of restitution should be reduced to $660, a figure which more accurately reflects what he asserts is the City's actual cost for the abatement of his graffiti. The minor also contends the matter should be remanded for a new hearing because the court failed to

---

[4] Upon questions by the juvenile court, Eusebio confirmed this assumption.

6

determine his ability to pay the restitution as required pursuant to Welfare and Institutions Code section 742.16, subdivision (b). We agree as to the first point, but disagree as to the second.

## I. Restitution Award

While this appeal was pending, the California Supreme Court granted review in *Luis M.* and subsequently issued its opinion in *Luis M. v. Superior Court* (2014) 59 Cal.4th 300 (*Luis M.*). Neither party requested supplemental briefing after the Supreme Court's opinion was published.[5] We discuss that opinion, *post*.

"In 1982, by initiative, the voters of California added a provision to the state Constitution establishing a new constitutional right: the right of every crime victim to obtain restitution from the perpetrator of the crime for losses suffered." (*People v. Crow* (1993) 6 Cal.4th 952, 956.) Section 730.6, the general statute implementing this constitutional provision, governs restitution by minors who, as here, are made wards of the court.[6] The purposes in ordering victim restitution in juvenile cases are to rehabilitate

---

[5] We did request and receive supplemental briefing regarding the Court of Appeal decision in *Luis M*. There, Division 7 of the Second District held that because the Sheriff's Department was not a direct victim, investigation costs related to graffiti vandalism could not be recovered as part of a restitution award; the general costs of maintaining graffiti abatement equipment and tracking graffiti were not economic losses subject to restitution; and the fee study model used in that case did not reflect actual cleanup cost. (*In re Luis M.* (2012) 210 Cal.App.4th 982.)

[6] In pertinent part, section 730.6 provides in pertinent part: "(a)(1) It is the intent of the Legislature that a victim of conduct for which a minor is found to be a person described in Section 602 who incurs any economic loss as a result of the minor's conduct shall receive restitution directly from that minor. [¶] (2) [T]he court shall order the minor to pay . . . the following: [¶] [¶] (B) Restitution to the victim or victims, if any, in accordance with subdivision (h)." Subdivision (h)(1) provides in pertinent part: "A restitution order pursuant to subparagraph (B) of paragraph (2) of subdivision (a) . . . shall be of a dollar amount sufficient to fully reimburse the victim or victims for all determined economic losses incurred as the result of the minor's conduct . . . including all of the following: [¶] (A) [T]he actual cost of repairing the property when repair is

7

the minor, deter future delinquent behavior, and make the victim whole through compensation for his or her economic losses. (*In re Anthony M.* (2007) 156 Cal.App.4th 1010, 1017 ["The purpose of an order for victim restitution is threefold, to rehabilitate the defendant, deter future delinquent behavior, and make the victim whole by compensating him for his economic losses"].)

Our high court in *Luis M.* discussed the graffiti abatement costs for which restitution can be obtained under section 730.6.[7] "Under the general statute [section 730.6], a restitution award for economic losses [citation] may include the materials, equipment, and labor costs incurred for remediation. Preexisting expenditures, such as salaried employees and equipment purchases, may be included provided those costs can be fairly apportioned on a pro rata basis to the minor's conduct." (*Luis M.*, *supra*, 59 Cal.4th at p. 309.) The court continued: "This summary is not intended as an exhaustive list. The court ultimately retains discretion to fix the amount of restitution using 'any

---

possible [¶] . . . . [¶] (D) Wages or profits lost by the victim . . . Wages or profits . . . due to time spent as a witness or in assisting the police or prosecution. [¶] . . . . [¶] (j) For purposes of this section, 'victim' shall include: [¶]. . . [¶] (2) Any governmental entity that is responsible for repairing, replacing, or restoring public or privately owned property that has been defaced with graffiti or other inscribed material, as defined in subdivision (e) of Section 594 of the Penal Code . . . ."

[7] As the *Luis M.* court noted, there is a second statutory mechanism for restitution in graffiti vandalism cases: The general statute, section 730.6, subdivision (h), authorizes full restitution for economic losses, including "the actual cost of repairing the [damaged] property when repair is possible." (§ 730.6, subd. (h)(1), italics added.) Awards under section 730.6 are based on proof of the damage actually linked to the minor's conduct and do not include investigative costs. In contrast, sections 742.14 and 742.16 of the Graffiti Program authorize restitution based on the average costs for graffiti investigation and remediation per unit of measure." (*Luis M.*, *supra*, 59 Cal.4th at p. 307.) But the average cost mechanism under the Graffiti Program statutes is not available unless the city or county adopts an ordinance authorizing the probation department to recoup that governmental entity's costs as restitution in a juvenile proceeding and has updated its cost model within the three years preceding the court's restitution order. (*Id*. at p. 308.) As we shall discuss *post*, these provisions are inapplicable here.

8

rational method . . . provided it is reasonably calculated to make the victim whole . . . ' " (*Ibid.*) "While the court need not ascertain the exact dollar amount of the City's losses [citation] its calculation under section 730.6 must have some *factual nexus* to the damage caused by the minor's conduct." (*Ibid.*, italics added.)

The *Luis M.* court rejected the use of the restitution model in that case concluding: "Here, the juvenile court based its estimate on an *average of all costs* of graffiti cleanup rather than a rational estimate of costs occasioned by Luis's conduct. The People provided no evidence of the size or type of Luis's graffiti. There was no evidence about the materials, equipment, and labor required to remove it. We cannot determine, for example, if the City painted over a small area or used more expensive equipment to restore the property's surface." (*Luis M.*, *supra*, 59 Cal.4th at p. 309.) The court later explained: "[T]he trial court retains broad discretion under section 730.6 to estimate the material, equipment, and labor costs necessary to repair the damage caused by a discrete act of graffiti. According to the record before us, the City photographs graffiti as part of its investigation and tracks all incidents by computer. *The photographs presumably reflect the size, extent, and type of graffiti involved. Using such evidence, a witness familiar with graffiti abatement could estimate the average cost per square foot (or other measure) to paint over or otherwise restore the defaced surfaces. Alternatively, business records reflecting time and materials might provide a rational basis for estimating costs.*" (*Id.* at p. 310, italics added.)

Courts have broad discretion in fixing the amount of restitution, and they may use any rational method, provided it is reasonably calculated to make the victim whole. (*Luis M.*, *supra*, 59 Cal.4th at p. 305; *People v. Hurtado* (2019) 35 Cal.App.5th 871, 878 (*Hurtado*).) And we review restitution awards for abuse of discretion. (*Luis M.* at p. 305.) But there still must be a factual nexus between the amount of restitution ordered and the damage caused by the minor's conduct. (*Id.* at p. 309.) Court of Appeal cases published after *Luis M.*, illustrate the application of *Luis M.* regarding restitution under

9

section 730.6 and provide examples of the factual nexus requirement in the graffiti vandalism context.

In *People v. Santori* (2015) 243 Cal.App.4th 122 (*Santori*), a crime prevention officer calculated the cost of graffiti removal per minute based on the costs of the cleanup crew, administrative costs, the use of a private vender computer program and her salary. (*Id.* at p. 125)  She did not know how long it actually took to clean up each of the defendant's incidents, but testified that generally it took an average of 100 minutes to remove an item of graffiti. (*Ibid.*)  Based on the photographs of 32 graffiti incidents, she further opined that 100 minutes was a reasonable estimate for each one depicted, even though some may have taken less time and some may have taken more. (*Ibid.*)  The total cost was determined by multiplying the 32 incidents by 100 minutes by the per minute cost. (*Ibid.*)  Contrasting *Luis M.*, the *Santori* court relied on the fact the crime prevention officer considered the photographs depicting defendant's graffiti whereas none were considered in *Luis M.*; thus, the *Santori* crime prevention officer's opinion was not based solely on the average for graffiti removal, but also on her estimate as to defendant's specific graffiti. (*Id.* at pp. 126-127.)  The court also noted the defendant did not challenge the 100 minute estimate regarding any of the acts of graffiti and did not identify any photograph that would support his claim that the restitution order was unreasonable. (*Id.* at p. 127.)

In *People v. Aguilar* (2016) 4 Cal.App.5th 857 (*Aguilar*), a contractor hired by the city painted over defendant's graffiti, an area of approximately 500 square feet. (*Id.* at p. 860.)  Three photographs were admitted into evidence. (*Ibid.*)  A flat rate cost of $475 was assessed for restitution. (*Ibid.*)  The city's graffiti abatement coordinator testified this was a " 'fair price' " for this particular graffiti, based on the size and extent of the graffiti, the amount of paint it took to cover it and the fact the remediation had to be done quickly because of the profane nature of the graffiti, which was on a daycare center. (*Id.* at p. 861.)  Admittedly, the abatement coordinator did not know the actual cost of the

10

paint, the number of hours spent, the hourly wage paid to the painter or painters required for the remediation.  (*Ibid*.)  The trial court agreed, however, that the restitution was appropriate given the extent of the damage depicted.  (*Ibid*.)

The *Aguilar* court noted that in *Luis M*., our high court found it significant that there were no photographs or other description of the graffiti except to note that it involved a traffic sign and several electrical boxes.  (*Aguilar*, *supra*, 4 Cal.App.5th at p. 863.)  It also noted our high court's explanation that " 'a witness familiar with graffiti abatement' could use photographs or other evidence of 'the size, extent, and type of graffiti involved' to 'estimate the average cost per square foot or other measure to paint over or otherwise restore the defaced surfaces.' "  Reasoning that *Santori* was somewhat analogous, the *Aguilar* court affirmed the restitution award.  Although the abatement coordinator did not provide a time estimate for the remediation as in *Santori*, he did consider the photographs depicting defendant's graffiti and, based on his experience, opined that the flat fee of $475 was a " 'fair price' " to remediate defendant's graffiti. (*Id*. at p. 865.)  He considered the large area involved, the necessity for expedited removal and the general costs of paint and labor.  Given this, the *Aguilar* court found a factual nexus to the defendant's conduct.  (*Ibid*.)

In *Hurtado*, *supra*, 35 Cal.App.5th 871, the city determined the cost of abating graffiti by using a cost per square foot formula.  It then multiplied the total square footage of the minor's graffiti to determine the requested restitution amount.  (*Id*. at p. 874.) Each specific graffiti incident of defendant's graffiti was detailed and costs associated with each count were provided.  (*Ibid*.)  The evidence disclosed that the city uses an app to track all graffiti removed, and for each incident, the individual abating the graffiti uploads a photograph of the graffiti as well as the date, time, location, type of surface defaced, the removal method and total square footage.  (*Id*. at p. 875.)  The app generates a report with the estimated cost of abatement for each incident using cost per square foot formula developed by the city.  (*Ibid*.)  The prosecutor argued that there was a sufficient

nexus to the minor's conduct because the photographs of each incident were introduced and there was specificity as to the method of abatement. (*Id*. at p. 877.) In ordering restitution, the juvenile court made clear it was " 'not adhering to any mathematical formula.' " (*Id*. at p. 878.) It also noted that it considered evidence from the preliminary hearing and the photographs introduced into evidence to support the claimed amounts based on square footage; it reasoned that square footage was a rational factor to consider. (*Ibid*.)

On appeal, the *Hurtado* court found it significant that the witness in *Luis M*. offered " 'no information about the actual abatement costs related to [the minor's] conduct.' " (*Hurtado*, *supra*, 35 Cal.App.5th at p. 879.) Unlike in *Luis M*., the prosecution "submitted photographs of each incident of graffiti attributable to Hurtado as well as evidence of the size of the square footage, the surface type on which each incident of graffiti occurred, and the removal method. More importantly, the method of calculation of the amount of restitution used by the City specifically considered the size of the graffiti Hurtado created." (*Id*. at pp. 879-880.)

The evidence our high court found lacking in *Luis M*. is lacking here. And the instant case stands in stark contrast to *Santori*, *Aguilar* and *Hurtado*. Critically, there were no photographs introduced in the restitution hearing. Consequently, the prosecution's witness here was not provided the opportunity to offer opinions about the cost of remediation based on the photographic evidence. Indeed, multiple times he said he could not give more specific answers without that evidence. And although the juvenile court had presided over the jurisdictional trial and may have had some memory of the photographic depictions of vandalism, it made no reference to any such recollection and did not cite it as a basis for its restitution award.

We must conclude there was insufficient evidence to support a factual nexus to defendant's conduct in the amount of the restitution award. On the other hand, there was

a factual nexus to the amount the minor suggested - $660. We conclude, the restitution award should be reduced to that amount.

## II. Minor's Ability to Pay

Citing section 742.16, subdivision (b), the minor contends the juvenile court imposed an unauthorized sentence when it failed to determine his ability to pay before ordering victim restitution.

Minor concedes he "did not challenge the issue in the juvenile court." We conclude the matter is forfeited. (*People v. Avila* (2009) 46 Cal.4th 680, 729 [defendant's failure to adduce evidence of inability to pay the maximum restitution fine forfeits challenge]; see also *People v. Trujillo* (2015) 60 Cal.4th 850, 859 [failure to object to assessment of probation costs on failure to pay grounds forfeited]; *People v. McCullough* (2013) 56 Cal.4th 589, 599 [failure to object to jail booking fees on failure to pay grounds forfeited].) As this court long ago noted in the context of restitution fines "[a]s a matter of fairness to the trial court, a defendant should not be permitted to assert for the first time on appeal a procedural defect in imposition of a restitution fine, i.e., the trial court's alleged failure to consider defendant's ability to pay the fine. [Citations.] Rather, a defendant must make a timely objection in the trial court in order to give that court an opportunity to correct the error; failure to object should preclude reversal of the order on appeal. [Citation.]" (*People v. Gibson* (1994) 27 Cal.App.4th 1466, 1468.)

Moreover, the minor's claim fails on the merits. Section 730.6, subdivision (h) states that a minor's "inability to pay shall not be considered a compelling or extraordinary reason not to impose a restitution order." However, the Graffiti Removal and Damage Recovery Program (§§ 742.10 – 742.22), which includes section 742.16 upon which the minor relies, authorizes cities and counties to "elect" by ordinance to have the county probation officer recoup the cost of graffiti abatement, and requires the city or county to make findings "to be reviewed at least once every three years, of the average cost to the city [and/or] county per unit of measure of removing [the]

13

graffiti . . . ." (§§ 742.14, subds. (a), (c), (d), 742.16, subd. (b).) Because an award of restitution under the Graffiti Program can include law enforcement agency investigative costs, an ability to pay requirement makes sense for restitution awarded under these statutory provisions. But here, there is no evidence in the record establishing that the City had an ordinance such that the provisions of the Graffiti Removal and Damage Recovery Program apply here.[8]

Consequently, section 742.16, subdivision (b) is not applicable, and no showing of the minor's ability to pay is required in this award of restitution grounded on section 730.6.

*****

---

[8] In the Attorney General's supplemental briefing, she acknowledged that while the City had a graffiti ordinance, that ordinance did not authorize the probation department to recoup the costs of graffiti abatement. (Sacramento City Code, §§ 8.24.010-8.24.0600.) Instead, it provided a mechanism for the City to recoup abatement costs from minors and their parents or guardians civilly, which the City was free to do here. (Sacramento City Code, § 8.24.050.)

## DISPOSITION

The juvenile court is directed to reduce its order of joint and several restitution to $660.

/s/
MURRAY, J.

We concur:

/s/
RAYE, P. J.

/s/
HULL, J.