Filed 9/14/22  P. v. Cross CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>JEROME LEE CROSS,<br><br>　　　Defendant and Appellant. | F082774<br><br>(Kings Super. Ct. No. 20CMS3804)<br><br><br>**OPINION** |

-ooOoo-

## THE COURT*

APPEAL from a judgment of the Superior Court of Kings County.  Michael J. Reinhart, Judge.

Jean M. Marinovich, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Cavan M. Cox, and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

* Before Hill, P. J., Poochigian, J. and Detjen, J.

## INTRODUCTION

Appellant and defendant Jerome Lee Cross was convicted of one count of felony vandalism exceeding $400, after he threw a rock and shattered the front glass door of the Hanford Police Department. (Pen. Code, § 594, subd. (b)(1).)[1] Vandalism is a felony if the amount of the damages is $400 or more. (*Ibid.*) At trial, the court overruled defense objections and permitted the prosecution to introduce evidence that the damages were $598, based on $300 to temporarily board up the shattered glass door a few hours after the vandalism, and $298 for the replacement safety glass that was installed three days later. The jury found the damages resulting from defendant's vandalism was $400 or more, and he was sentenced to the second strike term of four years in prison.

On appeal, defendant renews the arguments he made at trial, that the actual damage resulting from the vandalism of the glass door was limited to the replacement cost of $298, and the temporary repair of $300 was an indirect cost and should not have been considered by the jury, and his conviction must be reduced to misdemeanor vandalism. We affirm.

## FACTS

At approximately 3:00 a.m. on Sunday, August 2, 2020, Officer Rubalcava was in her patrol vehicle and parked in the rear compound of the Hanford Police Department. She received a dispatch that an act of vandalism had just occurred at the police department's front glass door entrance. The glass was broken out of the door frame, and a rock that was "a little smaller than a football" was found inside the building.

Officer Rubalcava drove on Lacey Boulevard to look for the suspect and saw defendant walking fairly quickly on the street. Defendant kept his head down, and he was sweating profusely and breathing heavily. Rubalcava contacted defendant. He was initially calm but became irate with another officer.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

Officer Rubalcava arrested defendant and took him to the jail for booking. When Rubalcava escorted him into the jail, defendant stumbled and needed assistance so he would not fall. During the booking search, defendant was found in possession of a usable amount of methamphetamine. When the drugs were found, defendant said, "[I]f I had known that was there I would have smoked it already."

It was stipulated to the jury that defendant threw the rock that broke the glass door.

The prosecution introduced invoices for the temporary repair and replacement of the broken glass door. Erin Payne, owner and manager of Kings County Glass, testified that on Sunday, August 2, 2020, the business performed "an emergency weekend board up" on the damaged door at the police department. The business charged $300, which Ms. Payne described as a reasonable price for an emergency boarding job performed on a weekend.

David Lockwood, owner of Hanford Glass, testified that on Monday, August 3, 2020, he received a work order from the police department because "the glass had broken out of the door that goes into the main door of the police department." Lockwood measured the frame and ordered the safety glass that was required to replace that door. It took three days to get safety glass because it was not readily available. On August 6, 2020, Lockwood installed the safety glass. The cost to replace the glass door was $298, which Lockwood described as a reasonable amount.

As will be explained below, the prosecution argued the actual damage to the door was $598.

**Defense**

Defendant testified that he was self-employed and washed cars. Defendant had a prior strike conviction from 2009.

At trial, defendant admitted he threw the rock through the police department's glass door and testified that he "did it for love." Defendant explained that just before the incident, he used his unemployment benefits to purchase a 2004 "shiny red" Cadillac

CTS with a sunroof. "I was just in love with this car" and "it was the only thing in this world that I loved." He was homeless, he considered the car as his home, and his possessions were stored in the car. His cousin told him not to drive the car until he completed the registration process. He parked the car on 8th Street and walked to a friend's house.

Defendant testified that he felt that he needed to go back and check his car. Around 3:00 p.m., he arrived at the location where he parked the Cadillac and found police officers were "searching his car." "I was like what are you doing with my car. So they jammed me up, pulled me to the side, gave me the field sobriety test and – and the sun was in my eyes so I turned like toward Harris Street … and [when] I turned toward 8th Street back to the car and when I was done with the sobriety test the car was gone, they towed it. I got irate, irrational."

According to defendant, the officers said they towed the car because of the registration: "They told me I didn't have registration for the car, and they don't have to tell me anything. I am not the owner – the registered owner of the car. And I was like, I have the keys right here on my neck, and they was like that doesn't matter, whatever. So I was like I would like to file a [citizen's complaint] … I will write your ass up … and they was like whatever but your car is gone. *So I didn't know where the towing company had it* or anything like that the VIN numbers, anything to get it back and … everything was in the car. My laptop, my phones, my jewelry, my money, clothes, everything…." (Italics added.)

On further questioning, defendant admitted that one officer told him the car was taken to Hanford Towing. Defendant did not go to the tow yard because it was too far away.

Around 5:00 p.m., defendant walked to the Hanford Police Department to file a citizen's complaint. He entered the police department, and an officer was "really aggressive" toward him. "[S]omeone at the door [said] you get out of here, you leave

4.

right now. And I was like I just want to file [a] … citizen complaint form. And they was like, no, you leave right now, you cannot have a citizen complaint. I said, well, they took my car, and he was like so what[,] you get out now, or you will be arrested. So I just hung my head and I just bounced."

Defendant testified that he stayed around the civic auditorium all night, "getting high, whatever, just chilling, just trying to figure out what to do."

> "I don't have my car, I have nothing. I didn't have my EDD card in my pocket. I didn't have no money or nothing, so I don't know, it just – morning came and I was out of drugs I thought, and I was just wandering around the streets and I seen the rock and I was like them bastards, they took … the only thing I owned, the only thing I loved, they took it from me. They ripped it from my heart. [¶] That is why I threw the rock through the window. Something told me in my head do not do it, do not do it, and I shook it off. I should have listened to that voice in my head. I should have listened to that voice in my head, but I threw the rock and I am here."

Defendant was arrested that night, and admitted an officer found drugs in his sock when he was booked at the jail. Defendant testified that he was surprised the drugs were in his sock, forgot he had the drugs, and did not realize he brought drugs into the jail: "I sure wish I would have known, because I would have smoked that up."

## PROCEDURAL BACKGROUND

On September 9, 2020, an information was filed in the Superior Court of Kings County charging defendant with count 1, felony vandalism exceeding $400, in that he unlawfully and maliciously damaged and destroyed a glass door, real property which belonged to the Hanford Police Department, in the amount of $400 and more (§ 594, subd. (b)(1)), and count 2, bringing a controlled substance into the county jail (§ 4573, subd. (a)); with one prior strike conviction (§§ 667, subds. (b)–(i), 1170.012, subds. (a)–(d)).

On March 22, 2021, defendant's trial began with motions. The court accepted an agreement between the parties that defendant would stipulate he maliciously damaged the

police department's glass door, that amounted to at least a misdemeanor offense, with the only disputed issue being the actual amount of damages; and the People would allow defendant to testify about the motive for his actions, that was relevant as to count 2 and whether he was so agitated and upset that he did not knowingly bring methamphetamine into the jail. The court advised defendant of his constitutional rights and the impact of the stipulation, and he waived his rights and agreed to stipulate to the misdemeanor charge.

**Preliminary Arguments About Damages**

During a recess in the prosecution's case, the court asked the parties for briefing on how to calculate damages to determine whether count 1, vandalism, was a felony or misdemeanor, whether the vandalism damages included the temporary placement of boards over the broken doorway, or if the damages were limited to replacement cost of the glass door.

Defense counsel argued that restitution statutes should be considered when determining the value of damaged property for purposes of vandalism, and damages under section 594 should be limited to "the actual cost of repairing damaged property – with the repairs actual[ly] possible." Counsel stated the People's arguments about aggregating the temporary repair and replacement costs were refuted by *In re Kyle T.* (2017) 9 Cal.App.5th 707 (*Kyle T.*), that "goes to the proposition of actual cost that might include the extraneous cost like boarding of the window, or before it gets repairs." The prosecutor replied the repairs in this case were properly aggregated because they resulted from one act that damaged the glass door.

**Motion to Dismiss the Felony Charge**

After the prosecution rested, defense counsel made a section 1118.1 motion to dismiss as to count 1, felony vandalism of $400 or more, and argued damages were only $298 based on the cost to replace the glass door, and the charged felony offense must be reduced to a misdemeanor pursuant to section 17, subdivision (b).

The court stated the question was whether damages under section 594 encompassed "both the temporary repairs for the use of the wood placed in the door, and those temporary repairs also be combined with the permanent repairs of the door through the glass company … and aggregate those two figures to determine if the value exceeds the $400 in the statute." The court stated:

> "[T]here [is] plenty of case law that supports aggregation of damages to various items to reach the $400 limit so long as those items are damages during the course of the same conduct. There is one item that was damaged. While noting that the term damages in the statute may not be coextensive with amounts of restitution that could be ordered in a sentence. There was some language in the case of *Luis M. v. Superior Court* [(2014)] 59 [Cal.4th] 300, at page 405, that this Court finds [instructive]. And in that case the value of the stolen property or damaged property shall be at a replacement cost of the property or the actual cost of repairing the property when repair is possible. The Court is of the opinion, and that is a good definition also the term damages in [section] 594, and would adopt in making the ruling that I will be denying the [section] 1118.1 motion, because … the temporary placing of the wood in the door was an actual cost of the repair, and in the process of repair. So I will allow the matter to go to the jury."

Defense counsel argued that actual damage resulting from the vandalism was "the damage of the rock going through the glass," that amount was $298, actual damage did not include "additional economic loss" arising from the temporary repair, and the court could not aggregate "economic loss" and "actual damage." Counsel further argued the People could not "bootstrap" the cost for the temporary repair because it was not permanent. Counsel suggested there were other, less expensive options than temporarily boarding the door, and an officer could have parked in front of the police department to watch the entrance "until a glass company could come in immediately, then there wouldn't be this bootstrap." Counsel questioned whether the chosen glass company was the "most expeditious place to get the glass done" since it took three days to get the new door.

7.

The court stated the question for a section 1118.1 motion was whether there was a "sufficient factual basis to warrant it to go to the jury for determination. The Court reads and is holding that a reasonable jury on its facts to find that it was a process of repair as opposed to distinct repairs … it means it goes to the jury. Whether it is beyond a reasonable doubt it up to them. You can argue … the reasonableness of the cost."

Defense counsel again argued that damages for purposes of vandalism was limited to the actual repair cost "for a rock going through that glass door," and the police department should bear the cost if it lost money by having the door boarded up for three days.

The court disagreed and stated the question was "what is the injury to the victim, because it is punishment that this element [of damages] goes to." The court again denied the section 1118.1 motion, and also denied the defense motion to reduce the felony to a misdemeanor, without prejudice to raising the motion later.

Prior to closing argument, the prosecutor asked the court to prohibit the defense from arguing to the jury "whether the amount of value being $400 or more is a felony as opposed to a misdemeanor." The court ordered that the parties could not discuss the issue of punishment in closing argument, and the jury could not consider punishment in this case. The jury received a special verdict form to find whether the damages were greater or lesser than $400, but the jury was not advised that the amount of damages would determine whether defendant was convicted of a felony or a misdemeanor.

**Instructions**

As to count 1, vandalism, the jury was instructed with CALCRIM No. 2900 on the elements of the offense.

> "To prove the defendant is guilty of this crime the People must prove that: [¶] One, the defendant maliciously damaged real property. [¶] And two, the defendant did not own the property. [¶[ Someone acts maliciously when he intentionally does a wrongful act, or when he acts with the unlawful intent to annoy or injure someone else."

8.

The court also gave CALCRIM No. 2901:

"If you find the defendant guilty of vandalism in Count 1, you must decide whether the People have proved that the amount of damaged caused by the vandalism was $400 or more. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that this allegation has been proved." (RT 924)

**Closing Arguments**

As to count 1, the prosecutor reminded the jury that defendant admitted he damaged the property and acted with malicious intent, and "the question is whether or not the damage was greater than $400." "The case law is clear, what was the replacement cost or the actual cost of replacement property. What that means is what was the cost to the Hanford Police Department." The prosecutor cited the testimony of the witnesses from the two glass companies – that $300 was a reasonable charge for the "emergency board up" on a Sunday, and $298 was a reasonable price for the safety glass required to replace the door – and argued the actual cost of the damage resulting from defendant's vandalism was $598. "The board up was part of the [re]placement cost, it was part of the repair. The Judge earlier told you don't forget your common sense…. What is inside of a Police Department? Can they leave the front door broken for really for any period of time? They had to board it up and that is part of the cost of the repair or cost of the replacement property. And the construction of the matter is what is the injury to the victim. Here the victim was the Hanford Police Department. The amount of damages, the injury to the Hanford Police Department was $598."

In her closing argument, defense counsel acknowledged defendant admitted he broke the glass door, but "the issue is the actual amount of damage" to the police department, and not the "actual cost." Defense counsel argued the actual amount of damage to the glass door was $298, based on the cost to replace the door. Defense counsel agreed that the police department had to board up the broken door but argued that

9.

represented an "extraneous cost" that could not be considered part of the actual damage to the door.

In rebuttal argument, the prosecutor replied the question was the "actual amount of damage caused by the vandalism" to the police department's door, and that amount was what the police department actually spent as a result of defendant's vandalism. There was no evidence of any extraneous costs aside from boarding up the broken door until the new glass was installed. "You aggregate this one act that happened. He threw a rock through the door, and the actual costs to the Hanford Police Department based on [defendant's] actions was [$]598. And so, yes, I do get to add up the damage, because it was the actual cost to them."

## VERDICT AND SENTENCE

On March 23, 2021, the jury found defendant guilty of count 1, felony vandalism, and made a separate finding that the amount of damage caused by the vandalism was more than $400.

The jury also found the prior strike conviction true. Defendant was found not guilty of count 2, bringing methamphetamine into jail.

**Motion to Reduce the Conviction**

On May 10, 2021, the court held the sentencing hearing. Defense counsel renewed the motion to reduce count 1, felony vandalism, to a misdemeanor pursuant to section 17, subdivision (b), based on her previous arguments that the actual damage from the vandalism was only $298. The prosecutor again argued that the cost of the "emergency board up" of the broken door was part of the actual damages resulting from the vandalism because any business, even if not the police department, would have to protect the interior if the front door was broken, and defendant should not get a "windfall" because the actual cost for the repair was in two segments. Defense counsel replied that if the police department kept "an extra glass door in their storage room, the actual cost would be [$]298."

10.

The court stated that it previously ruled the cost of the temporary repairs could be considered by the jury to determine whether the damages exceeded $400, but it had not decided "one way or another that it did or did not, I made a ruling that it could be considered because under one theory it could be considered a continuing process of repairs. And … both sides argued that issue before the jury."

The court denied defendant's motion to reduce the felony conviction to a misdemeanor because "[t]he jury did determine that it was part of the damages."

**Sentencing**

Defense counsel argued defendant should receive the mitigated term since he admitted guilt. The court acknowledged defendant's stipulation but found defendant's prior criminal record was significant and decided to impose the midterm of two years, doubled to four years as the second strike sentence.

The court imposed a restitution fine of $300 (§ 1202.4, subd. (b)) and stayed the parole revocation fine in the same amount (§ 1202.45); imposed the court facilities assessment of $30 (Gov. Code, § 70373) and the court operations assessment of $40 (§ 1465.8); and also ordered victim restitution of $598 to the City of Hanford and the Hanford Police Department (§ 1202.4, subd. (f)).

On May 11, 2021, appellant filed a notice of appeal.

**DISCUSSION**

Defendant contends his conviction for felony vandalism is not supported by substantial evidence that the amount of actual damage was $400 or more, and the conviction must be reduced to a misdemeanor. Defendant argues that valuation of actual damage from vandalism is limited "to 'direct' abatement costs, determined by the cost of repair," and that amount was limited to $298 to replace the damaged glass door. Defendant asserts the trial court improperly permitted the jury "to consider the additional $300 cost to board up the door pending actual repair," but that amount "served only to

11.

secure the premises, not to repair the door," and was "an 'indirect' economic loss" and could not be considered to determine actual damage for felony vandalism.

Defendant concludes that "only direct abatement costs may be included in the valuation.  Indirect costs, while recoverable as restitution, are not included.  Boarding the door to secure the premises pending actual repair is an indirect cost; therefore, it does not raise the valuation" of actual damage, and his vandalism offense was not a felony.

## I.      Standard of Review

In considering a challenge to the sufficiency of the evidence, "[t]he standard of review is well settled:  On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  If the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder."  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

While defendant has raised this issue as one of substantial evidence, he is effectively arguing the trial court incorrectly interpreted section 594 to permit the jury to consider "indirect" costs to determine if the actual damages resulting from his vandalism was $400 or more, so that offense was a felony.  To the extent defendant raises questions of statutory interpretation, we review the issue de novo.  (See, e.g., *John v. Superior Court* (2016) 63 Cal.4th 91, 95; *People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141.)

## II.     Vandalism

Section 594 states:  "Every person who maliciously commits any of the following acts with respect to any real or personal property not his or her own, in cases other than

those specified by state law, is guilty of vandalism:  [¶]  (1) Defaces with graffiti or other inscribed material.  [¶]  (2) Damages.  [¶]  (3) Destroys."  (§ 594, subd. (a).)

If the amount of the "defacement, damage, or destruction" is $400 or more, the offense is punishable as a felony or a misdemeanor.  (§ 594, subd. (b)(1).)  If such amount is less than $400, the offense is only punishable as a misdemeanor.  (*Id*. at subd. (b)(2)(A).)

Whenever a person violates this provision with respect to property belonging to a public entity, "it shall be a permissive inference that the person neither owned the property or had the permission of the owner to deface, damage, or destroy the property." (§594, subd. (a).)

## III.    Calculation of Vandalism Damages

Section 594 "does not itself specify a method for proving the amount of property damage in a vandalism prosecution…."  (*Kyle T*., *supra*, 9 Cal.App.5th at p. 713.)  The cases interpreting section 594 have focused on the amount of defacement, damage, or destruction, and calculated that amount as the actual or estimated cost of repair.  (See, e.g., *In re A.W.* (2019) 39 Cal.App.5th 941, 950 (*A.W.*); *Kyle T., supra*, 9 Cal.App.5th at pp. 713–714; *People v. Carrasco* (2012) 209 Cal.App.4th 715, 718, reversed on other grounds in *People v. Whitmer* (2014) 59 Cal.4th 733, 740–742 [a defendant may be convicted of multiple counts "based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme"].)

These cases have relied on the restitution analysis in a vandalism case, *Luis M. v. Superior Court*, *supra*, 59 Cal.4th 300 (*Luis M*.), for guidance on the calculation of damages to determine if a violation of section 594 was felony or misdemeanor vandalism.

### *Luis M.*

In *Luis M*., *supra*, 59 Cal.4th 300, a minor defaced six locations with nine acts of graffiti.  At the restitution hearing, an officer used a five-year-old cost model to estimate the city's annual graffiti abatement costs, that included labor and material costs for both

investigation and removal of graffiti. The officer compared that cost model to the city's annual expenditures, calculated the city's average outlay per graffiti incident, and then multiplied that figure by the minor's nine instances of graffiti to arrive at the total amount of loss. (*Id*. at pp. 304, 309–310.) The officer offered "no information about the actual abatement costs related to [the minor's] conduct." (*Id.* at p. 304.) The juvenile court ordered restitution in the amount of $3,881.88, based on the officer's testimony. (*Ibid.*)

*Luis M*. reversed the restitution order because it "was not based on sufficient evidence that the amount of claimed loss was a result of [the minor's] conduct." (*Luis M.*, *supra*, 59 Cal.4th at p. 303.) *Luis M*. cited the general restitution statute applicable to juvenile offenders, noted it was " 'parallel' " to section 1202.4's restitution provisions for adult offenders, and that it limited restitution to " 'economic losses incurred *as the result of the minor's conduct,*' " such as " 'the *actual cost* of repairing the property when repair is possible.' " (*Luis M.* at p. 304; *id*. at p. 305, italics added in original.)

*Luis M*. held the restitution award may include "the materials, equipment, and labor costs incurred for remediation," as well as "[p]reexisting expenditures, such as salaried employees and equipment purchases, … provided those costs can be fairly apportioned on a pro rata basis to the minor's conduct." (*Luis M., supra*, 59 Cal.4th at p. 309.) While a court awarding restitution "need not ascertain the exact dollar amount of the [c]ity's losses" (*ibid*.) and "retains broad discretion … to estimate the material, equipment, and labor costs necessary to repair the damage caused by a discrete act of graffiti," (*id*. at p. 310) the calculation "must have some factual nexus to the damage caused by the minor's conduct." (*Id*. at p. 309.) *Luis M*. held the city's restitution model did not reflect the actual or estimated costs to clean up the graffiti caused by the minor's conduct. (*Id*. at p. 303; cf. *People v. Hurtado* (2019) 35 Cal.App.5th 871, 879–880 [trial court's determination of restitution for vandalism conviction had sufficient factual nexus to damage caused by defendant's act, since it applied the standard cost to abate graffiti to the square footage and surface type actually damaged by defendant's acts].)

14.

*Kyle T.*

In *Kyle T.*, *supra*, 9 Cal.App.5th 707, a minor was alleged to have committed one count of felony vandalism based on graffiti defacement. At the juvenile hearing, an officer testified about the amount of damages, based on a single-page " 'graffiti removal cost list' " prepared by an unknown author, that generally summarized the costs of removing graffiti in that area, but without reference to the specific acts committed by the minor. (*Id.* at pp. 710–711.)

*Kyle T.* reversed the juvenile court's adjudication for felony vandalism and held the People failed to present substantial evidence that was specific to the minor's acts of vandalism to establish that the actual amount of damage caused by the minor's act reached the felony threshold of $400. (*Kyle T., supra*, 9 Cal.App.5th at p. 709.) *Kyle T.* acknowledged that section 594 did not specify the method to calculate damages to determine felony vandalism and held *Luis M.*'s discussion of restitution was appropriate to determine damages in a vandalism case. (*Kyle T.,* at p. 716.)

> "[S]ection 730.6, subdivision (h) of the Welfare and Institutions Code 'authorizes full restitution for economic losses, including "the *actual cost* of repairing [damaged] property when repair is possible." [Citation.] Awards under [Welfare and Institutions Code] section 730.6 are based on proof of the damage actually linked to *the minor's conduct ....*' [Citation.] This method for determining restitution arising from the abatement of juvenile vandalism 'parallel[s]' the method for determining restitution arising from the abatement of adult vandalism set forth in Penal Code section 1202.4, subdivision (f)." (*Id.* at p. 713.)

*Kyle T.* noted that section 1202.4 similarly defined restitution in adult criminal cases as the amount to fully reimburse the victim for every determined economic loss " 'incurred as the result of the defendant's criminal conduct'; the 'value of … damaged property shall be … the actual cost of repairing the property when repair is possible.' " (*Kyle T., supra*, 9 Cal.App.5th at p. 713, citing § 1202.4, subd. (f)(3)(A); see also *People v. Stanley* (2012) 54 Cal.4th 734, 737.)

15.

*Kyle T.* further held that under the " 'actual cost' " method, "the amount of the award 'must have some factual nexus to the damage caused by the [juvenile's] conduct.' " (*Kyle T, supra*, 9 Cal.App.5th at p. 716.)  Based on that standard, *Kyle T.* held the juvenile court's felony vandalism finding was not supported by substantial evidence because the officer's recitation of the average cost of graffiti removal, based on a generic, one-page cost list, was an unacceptable method of proving the amount of damage from the minor's specific acts of vandalism.  (*Id.* at p. 709.)  "The most obvious way for the People to prove that [the minor] committed felony vandalism would have been to introduce at the adjudication hearing an invoice setting forth the actual cost of repairs to the two properties.  No such evidence was introduced." (*Id*. at pp. 713–714.) *Kyle T.* suggested "a contractor's estimate of the cost to repair the actual damage that [the minor] caused might have sufficed, … assuming proper authentication and foundation. But the People afforded no such estimate either." (*Id*. at p. 714; see also *People v. Carrasco*, *supra*, 209 Cal.App.4th at pp. 717–718 [the defendant's conviction for felony vandalism affirmed based on actual cost to repair broken windows in a house and car, destroyed by the defendant's multiple acts of vandalism pursuant to a single intent].

In *A.W.*, *supra*, 39 Cal.App.5th 941, a juvenile court found true five allegations of felony vandalism resulting from the minor's graffiti defacement, and that the amount of actual damage exceeded the $400 felony threshold.  *A.W.* reversed the findings, relied on *Kyle T.* and *Luis M*., and held that average cleanup costs for graffiti could not be used to prove the actual damage caused by the minor's vandalism because "[t]he use of an average, or arithmetic mean, recognizes that cleanup costs for some graffiti is less than the average, and the cleanup costs for other graffiti exceeds the average.  The average cleanup cost is untethered to the actual damage caused by minor." (*A.W., supra,* 39 Cal.App.5th at p. 945.)

*A.W.* also held the juvenile court's calculation of damages for felony vandalism improperly included "the cost of law enforcement, which, though proper in certain

16.

restitution settings, was not a proper consideration in assessing the damage [the] minor inflicted under section 594." (*A.W., supra*, 39 Cal.App.5th at p. 945.) In doing so, *A.W.* relied on *Luis M.*'s discussion of the restitution statutes and distinguished between actual and indirect costs. (*A.W.,* at p. 950.)

> "[Welfare and Institutions Code section 730.6] … permits recovery of the 'actual cost of repairing the property .…' [Citation.] Similarly, section 594 requires the People to prove the amount of 'defacement, damage, or destruction,' which we interpret to include the cost of repairing or replacing the vandalized property. While the two statutes are different in that the burden of proof is much higher under section 594, they cover roughly the same categories of costs. What makes *Luis M.* instructive is that in the context of Welfare & Institutions Code section 730.6, our high court held that law enforcement costs are *not* recoverable: 'These general provisions do not authorize restitution orders for law enforcement investigative costs. [Citations.] "Under the relevant case law and the statutory scheme, public agencies are not directly 'victimized' for purposes of restitution under Penal Code section 1202.4 merely because they spend money to investigate crimes or apprehend criminals." ' [Citation.] *Instead, restitution is limited to the cost of repair, replacement, or restoration – these 'direct abatement costs' do 'not include the costs of investigation*.' [Citation.] Given the similarities in the recoverable categories of costs, investigative costs also cannot be included in the damage calculation under section 594." (*Ibid*., italics added.)

## IV. Analysis

In this case, the court's decision to permit the jury to consider the prosecution's evidence of the costs for both the "emergency board up" and replacement of the glass door was appropriate under section 594. We agree with the analysis in *Kyle T.*, based on the discussion in *Luis M.*, that damages for the purpose of determining felony vandalism is based on the actual cost of repairing the property when repair is possible. (*Kyle T., supra*, 9 Cal.App.5th at p. 713.) To the extent that defendant challenges the court's decision as a question of law, we agree with *A.W.* that the cost of repair, replacement or restoration are direct abatement costs that may be included in the damage calculation under section 594. (*A.W., supra*, 39 Cal.App.5th at p. 950.)

We further conclude there is substantial evidence to support the jury's finding that the damages resulting from defendant's vandalism exceeded $400, based on $300 for the temporary "emergency board up" and $298 for the permanent replacement of the glass door. We reject defendant's attempt to characterize the "emergency board up" as an "indirect" cost that must be excluded from the calculation of damages resulting from his act of vandalism. Defendant shattered the glass door at approximately 3:00 a.m. on a Sunday. The very timing of his act precluded any possibility the door could be immediately replaced. Under the circumstances, the temporary placement of boards would be necessary to secure the damaged main entrance to any structure, whether a business or a residence, and ensure the occupants remained safe, and the contents were not subject to theft, destruction, or further vandalism, until a replacement door was installed. In this case, there was even more urgency to immediately and temporarily secure the front entrance since defendant's vandalism damaged the glass entrance to a police department.

The police department's retention of Kings County Glass to temporarily install boards over the damaged front entrance was part of the direct and actual costs resulting from defendant's vandalism. It was part of the process set in motion by defendant's conduct, and necessary to secure the department's front entrance on a Sunday, until the glass door could be permanently replaced. There was thus substantial evidence to support the jury's finding that the damages from the vandalism exceeded $400, since securing the building's entrance immediately after the vandalism was a direct, reasonable, and actual cost of the process to permanently repair the door.

In contrast to *Kyle T.* and *A.W.*, the prosecution's evidence of the amounts charged by the two glass companies was based on testimony about the actual costs of the materials and services required to temporarily repair and permanently replace the actual damage resulting from defendant's vandalism of the glass door, and not based on speculative averages or estimates unrelated to the actual damage.

18.

While defendant suggests the police department could have used another glass company or a less expensive method to repair or monitor the shattered door, he never introduced any evidence to undermine the reasonableness of Kings County Glass's charge of $300 for the emergency "board up" job on a Sunday, Hanford Glass's charge of $298 for the requisite safety glass, that safety glass was required for the police department's front entrance, or that three days were required to obtain delivery of the safety glass.

## **DISPOSITION**

The judgment is affirmed.